No. 25-983

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MAXIMILIAN KLEIN, ET AL.,
*Plaintiffs-Petitioners*,

v.

META PLATFORMS, INC.,
*Defendant-Respondent*.

ON PETITION FOR APPEAL FROM THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
U.S. DISTRICT COURT CASE NO. 3:20-CV-08570-JD
HONORABLE JAMES DONATO

## META'S OPPOSITION TO PETITION FOR PERMISSION TO APPEAL ORDER DENYING CLASS CERTIFICATION

DAVID Z. GRINGER
ALEX W. MILLER
PAUL VANDERSLICE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

SONAL N. MEHTA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
(650) 858-6000
Sonal.Mehta@wilmerhale.com

February 24, 2025

*Counsel for Defendant-Respondent
Meta Platforms, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Respondent Meta Platforms, Inc. ("Meta") by and through its undersigned counsel, hereby certifies that Meta has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

*/s/Sonal N. Mehta*

SONAL N. MEHTA
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
(650) 858-6000

*Counsel for Defendant-Respondent*
*Meta Platforms, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

STATEMENT ........................................................................................4

    A. Meta Attracts And Retains Users By Providing Valuable
       Services For Free ........................................................................4

    B. Petitioners Proposed To Prove Classwide Antitrust Injury
       Using Only Economides's Opinion That Meta Would
       Pay All Users ...............................................................................4

    C. The District Court Found Economides's Injury Opinion
       Unreliable, Then Denied Class Certification ..............................6

STANDARD OF REVIEW ....................................................................7

ARGUMENT ........................................................................................8

    I.    The District Court Did Not Err, Let Alone Manifestly Err,
          In Denying Class Certification After Petitioners Were Left
          With No Common Means To Prove Injury .................................8

    II.   The District Court Did Not Err (Manifestly Or Otherwise) In
          Excluding Economides's Speculation That Meta Would Pay
          Hundreds Of Millions Of People $5 A Month To Use Facebook............14

        A. Economides's Injury Opinion Is Unreliable And Unsupported..........14

        B. Petitioners Sought To Certify A Class Based Only On The
           Lack Of $5 Payments ............................................................19

    III.  Petitioners Fail To Establish A "Death-Knell" Situation........................21

CONCLUSION ....................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455 (2013)..................................................................................12

*Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir. 1999) .....................22

*Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005).......................1, 7, 21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ....................6

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ....................................7, 15, 16

*Grodzitsky v. America Honda Motor Co., Inc.*, 957 F.3d 979 (9th Cir. 2020)..................................................................................11

*Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011 (9th Cir. 2024) ..............8, 11

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022)............................................3, 9, 11, 12, 13

*Ollier v. Sweetwater Union High School District*, 768 F.3d 843 (9th Cir. 2014).................................................................................15

*Stockwell v. City & County of San Francisco*, 749 F.3d 1107 (9th Cir. 2014).................................................................................13

*Teradata Corp. v. SAP SE*, 124 F.4th 555 (9th Cir. 2024) ....................................14

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).........................................9, 10

## RULES

Fed. R. Civ. P. 23 .........................................................1, 8, 10, 12, 13, 22

    23(b)(3) ............................................................................2, 11

    23(f) ..............................................................................2, 7, 22

Fed. R. Evid. 702 ........................................ 1, 2, 3, 6, 7, 10, 12, 13, 15, 19

    702(b)...................................................................................15

    702(d)...................................................................................15

iii

## INTRODUCTION

The petition seeks interlocutory review on the factbound question of whether the district court properly excluded an expert's opinion under Rule 702 and *Daubert*. That question implicates no unsettled or fundamental issue of law regarding Rule 23 and class certification—the court denied class certification because petitioners offered no means of establishing common impact without the excluded expert testimony. Nor does the district court's application of established precedent reflect the kind of "manifest error of law" that could otherwise justify this Court's immediate intervention. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). The Court should deny the petition.[1]

Petitioners sought to represent a class of Facebook users alleging that Meta had unlawfully monopolized a purported market for "personal social networking services." Because Meta provides Facebook for free, the putative class suffered no overcharge or other traditional antitrust injury. Instead, petitioners claimed they could prove antitrust injury on a classwide basis through expert testimony from an

---

[1] The district court denied class certification on January 24, 2025, 3-ER-265, and petitioners filed a Rule 23(f) petition which has been docketed in Appeal No. 25-853. The district court issued an amended opinion on February 13, 2025, 1-ER-16, which did not materially change the original certification order; petitioners nevertheless filed a second Rule 23(f) petition which resulted in Appeal No. 25-983. Meta submits that this second appeal is untimely and should be closed or consolidated with the first, but nevertheless files substantially the same response in both appeals.

economist, Nicholas Economides, who opined that in a but-for world where Meta had made different statements about its data practices, Meta would have paid each and every Facebook user $5 per month to use the service. The district court found that opinion to be unsupported by the factual record and inadmissible under *Daubert* and Rule 702. And because petitioners' only way to prove classwide antitrust injury was through Economides's uniform payment opinion, petitioners had no way to satisfy the elements of Rule 23(b)(3). The district court accordingly denied class certification. Because petitioners have identified no error in the decision below—much less a manifest one—interlocutory review is unwarranted.[2]

Though petitioners invoke Rule 23(f), their true objection is to the district court's unremarkable decision to exclude Economides's testimony. But Economides admitted that he could not identify any service provider like Meta that had ever paid all users for consuming or engaging with content, and instead said Meta would invent a new business model because (a) it had rejected proposals for paying subsets of users; and (b) apps Economides admitted were nothing like Facebook have paid small groups of people to participate in market research. The district court was well within its discretion to find these opinions "fanciful" and unsupported. 1-ER-9. And

---

[2] Meta—known as Facebook, Inc. until 2021—operates several applications and websites, including Facebook, Instagram, WhatsApp, and Messenger, as well as other businesses. References herein to "Meta" are to the company; references to "Facebook" are to that application.

while petitioners claim that this constituted an improper "merits decision," Pet. 3-4, they never dispute that "defendants may challenge the reliability of an expert's evidence under *Daubert*" and Rule 702 at class certification, especially where, as here, all discovery was complete and the record was closed. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.7 (9th Cir. 2022) (en banc). If the district court determines that the expert's methodology and evidence are unreliable, his opinions cannot support class certification. *Id.* at 665-66 & n.9.

Here, the court made the required "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [classwide] evidence to prove" antitrust injury, properly found them lacking under Rule 702 and *Daubert*, and then had to reject certification because petitioners had offered no alternative way to litigate the case collectively. *Olean*, 31 F.4th at 666. Petitioners' assertion that they should have been permitted to litigate their claims as a class because "when there is a plausible basis for the expert's opinion, it should be admitted and left to the jury to weigh," Pet. 14, is just wrong—reliability, not plausibility, is the standard for expert testimony. Economides failed that test. The Court should deny the petition.[3]

---

[3] " _-ER-_ " refers to the volume of petitioners' Excerpts of Record and page number. "SER-_" refers to Meta's Supplemental Excerpts of Record and page number.

## STATEMENT

### A. Meta Attracts And Retains Users By Providing Valuable Services For Free

Facebook offers its hundreds of millions of users valued features and engaging content to compete against numerous online platforms. Meta provides these services for free because its business model largely turns on selling advertising. An advertising platform requires attracting and retaining a broad user base with high-quality features and content. This model is hardly new; it began with ad-supported newspapers nearly four hundred years ago and continues to be used by news services, television stations, magazines, and a variety of online platforms (for example, Snapchat, TikTok, and YouTube). Users are attracted to a platform like Facebook by its content, and choose to spend their time there because of the value that content provides. Advertisers, in turn, pay platforms to reach those users.

### B. Petitioners Proposed To Prove Classwide Antitrust Injury Using Only Economides's Opinion That Meta Would Pay All Users

Petitioners sued under Section 2 of the Sherman Act, alleging that Meta misrepresented its data practices to monopolize a market for "personal social networking services" ("PSNS"). They define that market to include aspects of Facebook, Instagram, Google+, Snapchat, and MeWe from 2016 to 2020, and to have previously included Myspace. 2-ER-149-150, 164-166.

Petitioners and Economides know of no firm, PSNS or otherwise, that pays its users for consuming content online. SER-4-5 (Q. "[Y]ou can't think of any

4

examples in the real world where users are paid to consume content? A. I cannot think of an example right now."); SER-9 (Q. "In the time since your class certification deposition and whatever additional work you've done since then, have you identified any platform that pays all of its users for their activity on the platform, just their normal activity? A. Well, I think I understand what you're saying, and no, since my deposition I haven't identified any platforms that pay everybody."). Petitioners nevertheless assert they suffered an antitrust injury because, according to Economides, absent the claimed deception, competition would have led to Meta paying every active user $5 a month. 2-ER-174-177. Economides expressly disclaimed any injury other than lack of compensation, testifying that it was "[n]ot correct" that Meta would have competed on quality rather than payments in the but-for world. SER-3.

During the merits phase of expert discovery, Economides submitted an additional report reprising his opinion that the sole alleged classwide antitrust injury is lack of the compensation Meta supposedly would have paid in the but-for world. SER-18. He then submitted revised class certification reports incorporating those opinions. 2-ER-146. Economides never opined that Facebook users suffered a common injury through any reduction in the quality of Meta's services and petitioners did not seek damages tied to a quality reduction, SER-14 (damages are the "level of monthly compensation").

5

Petitioners relied solely on Economides's payment opinion to satisfy their burden of showing a common means of proving antitrust injury. According to petitioners, Economides's analysis demonstrated that "all users suffered the same harm—a $5 monthly overcharge," SER-11, because in "the but-for world, Facebook would compensate *all* Class members for their data at a competitive flat rate ($5 per month)," SER-16. Petitioners asserted "that the relevant question for class certification is simply 'whether each member of the class can rely on [the expert's] model to show antitrust impact,'" and that the "answer here is yes, *because Dr. Economides' analysis* is market-wide, applies equally to all consumers, and shows Facebook's anticompetitive deception harmed each class member." SER 13-14 (emphasis added and alteration in original). At the class certification hearing, petitioners confirmed that they were proceeding only on Economides's compensation theory, telling the court that "the antitrust injury for the users is a reduction in the level of compensation that would have been paid to all users." 1-ER-116.

### C. The District Court Found Economides's Injury Opinion Unreliable, Then Denied Class Certification

Meta moved to exclude Economides's injury opinion under Rule 702, as construed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. After a hearing, the district court granted Meta's motion and denied class certification. The court explained that "plaintiffs advance a single theory of

antitrust injury." 1-ER-3. "This theory is based entirely on the report of Dr. Economides, who opines that 'Facebook would have compensated [users] a certain amount per month for their data in the but-for world where [users] knew the truth about Facebook's data practices.'" *Id.* The court then applied Rule 702, reviewed the reasoning and support behind Economides's injury opinion in detail, 1-ER-7-14, and determined that "'there is simply too great an analytical gap between' the facts on which Dr. Economides relies" and his conclusion that Meta would compensate all users at a flat monthly rate in the but-for world, 1-ER-8 (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Because without Economides's testimony, petitioners "cannot establish that they have a class-wide method [of] proving antitrust injury," the court denied class certification. 1-ER-16. The district court did not reach the other, independent grounds for denying class certification raised by Meta. Dkt. 805-1.

## STANDARD OF REVIEW

"Petitions for Rule 23(f) review should be granted sparingly." *Chamberlan*, 402 F.3d at 959. Two situations in which interlocutory review can be appropriate are when (1) "the district court's class certification decision is manifestly erroneous"; or (2) "there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable." *Id.* "The kind of

7

error most likely to warrant interlocutory review will be one of law, as opposed to an incorrect application of law to facts." *Id.* at 960.

# ARGUMENT

## I. The District Court Did Not Err, Let Alone Manifestly Err, In Denying Class Certification After Petitioners Were Left With No Common Means To Prove Injury

Petitioners assert that the district court "manifestly erred in denying class certification based on its resolution of a merits issue—alleged lack of antitrust injury—that is common to the entire proposed class," Pet. 14, but this view of the appropriate inquiry at class certification is both irrelevant and wrong. Irrelevant because the district court did not determine *whether* putative class members had suffered an antitrust injury, but rather that the only means offered for answering that question on a classwide basis was unreliable and could not satisfy petitioners' burden of demonstrating that they could prove their claims with common evidence. Wrong because courts *must* assess the reliability of evidence presented at class certification in determining whether litigation can proceed on a collective basis. *Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011, 1031 (9th Cir. 2024). Because petitioners misstate both the decision below and the governing law, they have not demonstrated any manifest error warranting interlocutory review.

As the Supreme Court has explained, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively

8

demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And as this Court has explained, "to prove there is a common question of law or fact that relates to a central issue in an antitrust class action, plaintiffs must establish that 'essential elements of the cause of action,' such as the existence of an antitrust violation or antitrust impact, are capable of being established through a common body of evidence." *Olean*, 31 F.4th at 666. "This means that the court must make a 'rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [classwide] evidence to prove' the common question in one stroke." *Id.* (alteration in original). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351.

Here, certification turned entirely on whether petitioners had—through Economides's testimony—demonstrated a method to prove injury with common evidence. Petitioners conceded this below. They agreed that they needed "[c]ommon evidence [that] will demonstrate all class members suffered antitrust impact," SER-12, and did "not dispute that admissible expert testimony [was] essential to their ability to prove antitrust injury on a class-wide basis," or that they "rel[ied] entirely on Dr. Economides" to carry that burden at class certification, 1-

9

ER-16. The court's examination of Economides's opinions, however, had found them unreliable, unsupported, and inadmissible. 1-ER-7-16. "Without those opinions," petitioners could not "establish that they have a *class-wide method* proving antitrust injury." 1-ER-16 (emphasis added). That sufficed to deny certification. *Id.*

Petitioners ignore the district court's actual reasoning and imagine a "merits decision" based on an "alleged lack of antitrust injury." Pet. 3, 10-14. The court did nothing of the sort. It instead evaluated—as the Supreme Court, this Court, and Rule 23 require—the way that petitioners said they could prove classwide injury. Concluding that petitioners lacked a reliable means to demonstrate common injury is not an improper decision on the merits, even if it "entail[s] some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. To illustrate the point, petitioners' claims are currently live below, and there has been no conclusive ruling on whether they have suffered antitrust injury. The district court's ruling was squarely about whether petitioners could prove *common* injury and without Economides, it is obvious that they cannot.

Nothing about this is out of the ordinary: courts routinely apply *Daubert* and Rule 702 as part of class certification where the plaintiff seeks to rely upon expert opinions as the basis for certification. This Court has held not only that the "rigorous analysis" required prior to certification extends to expert testimony, but also that

10

"[i]n a class proceeding, defendants may challenge the reliability of an expert's evidence under *Daubert*." *Olean*, 31 F.4th at 665 n.7. Such a challenge is permissible because "[i]n carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any *admissible* evidence." *Id.* at 665. Hence, class certification "requires determining whether the expert's methodology is reliable," *Lytle*, 114 F.4th at 1031—and expert testimony that is unreliable cannot support certification, *Olean*, 31 F.4th at 665. Petitioners' argument cannot be reconciled with this established (and binding) case law.

This Court has in fact already approved the district court's approach to class certification in *Grodzitsky v. America Honda Motor Co., Inc.*, 957 F.3d 979 (9th Cir. 2020). There, as here, the plaintiffs claimed that expert testimony could demonstrate through common evidence that the windows of cars they had purchased were defective, a necessary element of their claims. *Id.* at 981-82. The district court excluded the testimony as unreliable under *Daubert*, then denied class certification because "without [the expert's] opinion, the plaintiffs were unable to demonstrate the requisite commonality" as to the claimed defect. *Id.* at 983-84. This Court affirmed, holding that the district court "must ensure that all admitted expert testimony is both relevant and reliable" at class certification, and agreeing that following the exclusion of the expert's defect opinion, plaintiffs "failed to demonstrate commonality." *Id.* at 985, 987. The same is true here: Economides's

11

testimony is the only means petitioners offered as their proof of common impact, so its exclusion precludes them from meeting the requirements of Rule 23.

Petitioners' "precedent" (Pet. 12-14) does not support reversal—largely because the district court, contrary to petitioners' mischaracterization, addressed their "ability to prove antitrust injury on a class-wide basis," 1-ER-16, not whether they had already proved it. Regardless, the cited decisions demonstrate no error.

Petitioners first distort *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455 (2013), to claim that the district court could not consider "inherently class-wide merits issues" like antitrust injury prior to certification. Pet. 3, 12-13. That is doubly flawed. First, *Amgen* recognized that district courts must consider so-called merits questions when "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." 568 U.S. at 466. And courts have long held that an antitrust class plaintiff *must* demonstrate "that the element of antitrust impact is capable of being established class-wide through common proof" prior to certification. *Olean*, 31 F.4th at 676. Second, *Amgen* held only that plaintiffs need not "prove materiality" to certify a class alleging securities fraud because it was "judged according to an objective standard." 568 U.S. at 459. *Amgen* did not involve *Daubert*, Rule 702, or evaluating the means the plaintiffs had offered for later proving materiality on a classwide basis; instead, the question was whether the plaintiffs had to prove materiality before certifying a class.

12

Demonstrating a means for proving common impact, in contrast, is a settled prerequisite for certification.

Petitioners' reliance on *Stockwell v. City & County of San Francisco*, 749 F.3d 1107 (9th Cir. 2014), is just as inapposite. Pet. 12-13. Like *Amgen*, *Stockwell* did not involve *Daubert* and Rule 702, nor the exclusion of an expert whose testimony presented the only means for proving a claim element with common evidence. Instead, the district court there resolved whether a regression model proved the plaintiffs' claims. *Id.* at 1116. The court explained "demonstrating commonality does not require proof that the putative class will prevail on whatever common questions it identifies." *Id.* at 1112. Here, the district court accepted that Economides's opinions, if valid, *could* answer common questions. The problem was that the opinions were unreliable, and petitioners offered no alternative means for litigating injury as a class. Nothing in *Stockwell* addresses that situation, or precludes district courts from applying Rule 702 and *Daubert*.

At its core, petitioners' grievance is with the district court's factbound application of Rule 702 and *Daubert*, not Rule 23, an improper "merits" decision, or any question with broader relevance to the law of class certification. This court has already held that a plaintiff seeking to represent an antitrust class must present a reliable means of proving injury on a classwide basis. *Olean*, 31 F.4th at 666. Without Economides, petitioners had not. That necessitated denying certification.

**II.    The District Court Did Not Err (Manifestly Or Otherwise) In Excluding Economides's Speculation That Meta Would Pay Hundreds Of Millions Of People $5 A Month To Use Facebook**

*A.  Economides's Injury Opinion Is Unreliable And Unsupported*

Petitioners challenge the district court's exclusion of Economides's testimony as manifest error.  Pet. 14-21.  But the exclusion was well-founded, based on multiple rounds of briefing, oral argument, and Economides's submission of *six* reports proffering the same opinions.  Starting from a handful of articles hypothesizing that in particular market conditions, competition might force firms to pay users to retain market share, Economides opined that Meta would have responded to additional competition by paying all of its users $5 a month.  Although he conceded that Meta and every other ad-supported platform (ever) had responded to competition by innovating and developing better features, not by making payments, he "guaranteed" that Meta would decide to compete through payments rather than on quality in his but-for world.   SER-3.   The district court properly held that this opinion is thoroughly unreliable and lacks any basis in the evidence.

Begin with the applicable law.  Petitioners claim (Pet. 14) that "when there is a plausible basis for the expert's opinion, it should be admitted and left to the jury to weigh."  But plausibility is not the standard—even in the decision petitioners cite for the proposition, which says that "expert testimony must be 'not only relevant, but reliable.'"  *Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024).

14

Consistent with that precedent, the district court explained that Rule 702 requires the proponent of expert testimony to demonstrate that "the testimony is based on sufficient facts or data" and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." 1-ER-5 (quoting Fed. R. Evid. 702(b), (d)). The court further explained that "[a]n expert's opinions are 'inherently unreliable' if they do not rest on a sufficient factual foundation and are 'speculative.'" *Id.* (quoting *Ollier v. Sweetwater Union High School District*, 768 F.3d 843, 861 (9th Cir. 2014)). That includes situations where an opinion "is connected to existing data only by the *ipse dixit* of the expert," such that a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 1-ER-6 (quoting *Joiner*, 522 U.S. at 146).

Petitioners nevertheless argue (Pet. 15-18) that the district court was not permitted to evaluate "[t]he factual basis of an expert opinion" under Rule 702, and "erroneously usurped the jury's role" by excluding Economides's injury model after concluding it was "not convincing." But the exclusion was based not on whether Economides's opinion was sufficiently "convincing," and the district court instead held that his imagined compensation regime lacked the reliability that Rule 702 requires, i.e., it was not "based on *sufficient* facts or data" and did not "reflect[] a reliable application of the principles and methods *to the facts of the case*." Fed. R. Evid. 702 (emphasis added). Rule 702 gives district courts "discretion to conclude

that the studies upon which … experts relied were not sufficient, whether individually or in combination, to support their conclusions." *Joiner*, 522 U.S. at 146-47. The court's exclusion of Economides's opinion was in no way an abuse of that discretion, let alone manifest error.

*First*, Economides's opinion that Meta would have paid all its users if it faced more competition disregarded how firms in the alleged PSNS market actually operated. Facebook and other platforms that sell ads compete for users by providing content that people want to engage with. SER-2; SER-7-8. So when Snapchat began capturing attention with Stories, Meta did not respond by offering users $5 per month to keep using Facebook. It instead created its own better version of Stories. Likewise, when TikTok emerged, Meta did not offer all users $5 per month to keep using Facebook. It created Reels to offer users short-form video. And Snap and TikTok themselves did not compete with Meta by offering to pay their users. Like Meta, they competed by innovating—as the district court explained, the "undisputed record" demonstrated "that firms in the PSNS market, including Meta, have consistently competed on the axis of quality through better content, functionality, services, and the like to keep users engaged and the stream of user data flowing, even if the firms theoretically could compete on price," (i.e., pay users). 1-ER-9. Indeed, Economides admitted that no ad-supported platform had *ever* responded to

competition by paying all its users. SER-9 ("I haven't identified any platforms that pay everybody.").

Petitioners primarily respond with "literature" on the theoretical possibility of paying people to use a service, Pet. 2-4, falsely claiming that the district court "recognized" such sources "support Professor Economides' opinions." Pet. 16. The court instead found that the articles Economides's relied on were equivocal or mere "commentary," often consisting of "the speculations of their authors." 1-ER-9-10. And "literature alone" cannot overcome undisputed facts; in the court's words, Economides's opinions had to "fit not just the literature but also the facts in the record." 1-ER-9. Economides could not draw that connection, as he cited no "meaningful contrary evidence" that firms in the alleged market would ever compete through payments. 1-ER-9. Economides's conclusions were instead "guesswork or speculation," that "simply disregard[ed] reality." 1-ER-10.

*Second*, petitioners argue (Pet. 18-20) that Economides's comparison of Facebook to market-research programs that paid users adequately supported his opinion. That too is wrong. His central programs were Meta's Study and Research, but (unlike Facebook) neither offers users engaging content or functionality. As the district court observed, they instead offer compensation to attract limited, invite-only participation in market research. 1-ER-11. Comparisons to market-research programs that (a) *cannot* attract users by competing on quality because they offer

17

participants no other value; and (b) have only a few thousand participants say nothing about whether Meta would ever compensate all of the hundreds of millions of Facebook users. Unlike Facebook, every app Economides considered (like Nielsen) compensates a limited number of people to participate in market research. 2-ER-180, 188-94. None are ad-supported businesses. None offer users engaging content. And none pays people to use a service or offers them a service at all. Simply put, none is anything like Facebook or any other PSNS firm. Unsurprisingly, Economides could "not explain how or why evidence of these transactions in a wholly different market" for research, "where the terms of exchange are different, would be informative of whether Facebook, in the PSNS market, would choose to compete on price as opposed to quality in the but-for world." 1-ER-11.

*Third*, Economides's references to internal Meta proposals about compensating users that the company rejected could not provide a reliable basis for his opinions. 2-ER-170-72. The district court explained that these were "preliminary discussions"—no more than "internal trial balloons" or "musings"— that "never ripened into serious proposals or an actual practice." 1-ER-11-12. Economides gave no credible justification for why this longstanding opposition at Meta would suddenly evaporate in the but-for world. He said only that Meta had not previously adopted such proposals because it "did not want to." 2-ER-172. That does not support a conclusion that Meta would "want to" in the but-for world. In all

18

events, the never-implemented proposals did not consider uniformly compensating all Facebook users, as Economides "guaranteed" would happen in the but-for world. SER-3. Under one rejected idea Economides cites, for example, the most aggressive estimate showed that Meta would pay only a very small proportion of users more than a few dollars *a year*. 2-ER-170.

In short, the district court was well within its discretion to conclude that Economides's foundational opinion—that Meta would have paid every one of the hundreds of millions of Facebook users $5 a month if only it had faced more competition—was "a conclusion of fiat rather than evidence." 1-ER-14. Such an opinion, divorced from real-world facts and with no real analysis or data to support it, is precisely what Rule 702 is designed to weed out. *Id.*

### B. Petitioners Sought To Certify A Class Based Only On The Lack Of $5 Payments

Petitioners make passing reference to an alternative theory of injury premised on quality (Pet. 20-21). That theory was not advanced below and cannot provide a basis for interlocutory appeal.

Petitioners' class certification motion offered (SER-13) only one theory of common antitrust injury: that all members of the putative class were harmed because "Facebook would have compensated [users] a certain amount per month for their data in the *but-for* world," i.e., Facebook users "would be offered monetary (or equivalent) *compensation* for their data." Petitioners' class-certification reply

19

confirmed that this lack of compensation was the sole alleged injury, stating only (SER-16) that "[i]n the but-for world, Facebook would compensate all Class members for their data at a competitive flat rate ($5 per month), so all were harmed in the actual world." And petitioners likewise represented at the certification hearing that "the antitrust injury for the users is a reduction in the level of compensation that would have been paid to all users." 1-ER-116. Put simply, petitioners below *never* described a change in quality as the basis for any common injury, and offered no means to prove such a change caused classwide harm.

Economides himself disclaimed any opinion on quality:

> Q. So in your but-for world, Facebook could have responded to more competition by offering better services instead of paying users; correct?

> A. Not correct. I think that paying users would be a crucial feature of the but-for world to make sure that people come to Facebook. Now, could it—could Facebook also have better features? Possibly. I don't know.

SER-3. Petitioners' new "quality" argument instead relies (Pet. 20-21) on Economides's off-hand references below to "non-cash compensation." But Economides explained that non-cash *compensation*, like rewards points, was simply a mechanism for paying users. 2-ER-137, ¶373. Nowhere did he identify any change in quality as the basis for a common injury, much less describe how such a change could be proven with class-wide evidence.

### III. Petitioners Fail To Establish A "Death-Knell" Situation

Petitioners have not demonstrated that "there is a death-knell situation for either the plaintiffs or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable," *Chamberlan*, 402 F.3d at 959. To the contrary—petitioners' only death-knell argument is that they will later lose *on the merits*. They never claim an inability to litigate the case to final judgment. That means petitioners can seek review in the normal course.

*First*, for the reasons given above, the district court's decision is correct, and not remotely "questionable." The Court need go no further to reject this basis for immediate appeal.

*Second*, petitioners have not established that the costs of continued litigation preclude pursuing their claims, i.e., established that "the representative plaintiff's claim is too small to justify the expense of litigation," *Chamberlan*, 402 F.3d at 958. In fact, petitioners plan to try their claims individually, Dkt. 894, and petitioners' counsel has explained that they are "not beholden to contingent income" and will "deploy [their firm's] unmatched financial resources" to this litigation. Dkt. 439 at 12. That proposal is consistent with courts' recognition that not every denial of class certification is a death knell, including because some law firms are willing to "act as champions for the class even if the representative plaintiff would find it

21

uneconomical to carry on with the case." *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 834 (7th Cir. 1999). A death-knell claim would be particularly implausible here given that the Sherman Act authorizes a reasonable attorney's fee to a prevailing plaintiff in most circumstances, providing an additional incentive for individual litigation. In any event, because petitioners have not even claimed that they will be unable to bear the costs of litigating this case individually, "death-knell" interlocutory review is unavailable.

*Third*, and relatedly, finding a death knell here would contravene the doctrine's purpose, which is to permit plaintiffs an interlocutory appeal when one on the merits will not be available. Rule 23(f)'s drafters were concerned that "[a]n order denying certification may confront the plaintiff with a situation in which the only sure path to appellate review is by proceeding to final judgment on the merits of an individual claim that, standing alone, is far smaller than the costs of litigation." Fed. R. Civ. P. 23 advisory committee's note to 1998 amendment. But because petitioners have *not* claimed that the expense of litigation will preclude a resolution on the merits, and indeed have sought to obtain one, review in the normal course will be available. Dkts. 894, 896 (summary judgment briefing in April, trial in November).

## CONCLUSION

The Court should deny the petition.

Dated:   February 24, 2025                Respectfully submitted,

                                          By:    */s/ Sonal N. Mehta*
                                                 Sonal N. Mehta

                                          WILMER CUTLER PICKERING HALE
                                          AND DORR LLP

                                          *Counsel for Defendant-Respondent*
                                          *Meta Platforms, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-983

I am the attorney or self-represented party.

**This brief contains** | 5,199 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Sonal N. Mehta | **Date** | 2/24/25

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 25-983

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Meta's Opposition to Petition for Permission to Appeal Order Denying Class Certification; Meta's Supplemental Excerpts of Record

**Signature** | s/Sonal N. Mehta     **Date** | Feb 24, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**        *Rev. 12/01/2018*