No. 25-983

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

MAXIMILIAN KLEIN, ET AL.,
*Plaintiffs-Petitioners*,

v.

META PLATFORMS, INC.,
*Defendant-Respondent*.

_____

ON PETITION FOR APPEAL FROM THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
U.S. DISTRICT COURT CASE NO. 3:20-CV-08570-JD
HONORABLE JAMES DONATO

**META'S SUPPLEMENTAL EXCERPTS OF RECORD**

DAVID Z. GRINGER
ALEX W. MILLER
PAUL VANDERSLICE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

SONAL N. MEHTA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
(650) 858-6000
Sonal.Mehta@wilmerhale.com

| **Date** | **Title** | **Page** |
|---|---|---|
| September 14, 2023 | Excerpts from the Transcript of the Deposition of Dr. Nicholas Economides [Dkt. 803-04] | SER1 |
| March 15, 2024 | Excerpts from the Transcript of the Deposition of Dr. Nicholas Economides [Dkt. 803-02] | SER6 |
| May 24, 2024 | Excerpts from Plaintiffs' Renewed Motion for Class Certification and Appointment of Class Counsel [Dkt. 793] | SER10 |
| July 8, 2024 | Excerpts from Plaintiffs' Reply in Support of Renewed Motion for Class Certification and Appointment of Class Counsel [Dkt. 815] | SER15 |
| January 12, 2024 | Excerpts from the Expert Report of Dr. Nicholas Economides [Dkt. 857-4] | SER17 |

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4   ----------------------------x

5   MAXIMILIAN KLEIN, et al.,   :

6   on behalf of themselves     :

7   and all others similarly    :  Case No.

8   situated,                 :  3:20-cv-08570-JD

9              Plaintiffs,  :

10    v.                  :  FULL VERSION

11   META PLATFORMS, INC., a     :

12   Delaware corporation       :

13   headquartered in          :

14   California,              :

15              Defendant.   :

16   ----------------------------x

17     CONTAINS CONFIDENTIAL and HIGHLY CONFIDENTIAL

18                 INFORMATION

19

20        Videotaped Virtual Deposition of

21         NICHOLAS ECONOMIDES, Ph.D.

22       Thursday, September 14, 2023

23           11:36 a.m. CST

24   Job No.: 505199
     Pages: 1 - 281

25   Reported Stenographically by:
     Tiffany M. Pietrzyk, CSR RPR CRR

CONTAINS CONFIDENTIAL & HIGHLY CONFIDENTIAL INFORMATION
Transcript of Nicholas Economides, Ph.D.
Conducted on September 14, 2023                                      71

| | | |
|---|---|---|
| 1 | understand the introduction not to discuss my staff | 13:20:12 |
| 2 | or not?  I'm not sure. | 13:20:15 |
| 3 | Q. You can just say your staff.  That's fine. | 13:20:17 |
| 4 | I don't need their names. | 13:20:19 |
| 5 | A. It was -- it was staff and counsel from the | 13:20:21 |
| 6 | case, this case that we are involved in. | 13:20:27 |
| 7 | Q. Okay. | 13:20:29 |
| 8 | A. Nobody else. | 13:20:31 |
| 9 | Q. So do you agree that, in the real world, | 13:20:35 |
| 10 | Facebook and Instagram offer their users valuable | 13:20:40 |
| 11 | content? | 13:20:44 |
| 12 | A. In general, yes. | 13:20:52 |
| 13 | Q. In forming your opinions in this case, how | 13:20:53 |
| 14 | did you account for the value of that content? | 13:20:56 |
| 15 | A. Well, I took it into consideration that | 13:20:59 |
| 16 | people come to Facebook because they get something | 13:21:03 |
| 17 | valuable from Facebook.  At the same time, Facebook | 13:21:07 |
| 18 | collects information from the users, which is also | 13:21:12 |
| 19 | valuable to Facebook.  So in many ways, this is an | 13:21:18 |
| 20 | exchange. | 13:21:23 |
| 21 | Q. So did you attempt to quantify the value of | 13:21:29 |
| 22 | the content users of Facebook and Instagram consume? | 13:21:32 |
| 23 | A. I did not because it wasn't necessary for | 13:21:41 |
| 24 | the calculations I did.  And as -- if we get down to | 13:21:43 |
| 25 | the damages and the impact calculations, you will | 13:21:49 |

SER2

CONTAINS CONFIDENTIAL & HIGHLY CONFIDENTIAL INFORMATION
Transcript of Nicholas Economides, Ph.D.
Conducted on September 14, 2023                                   102

| | | |
|---|---|---|
| 1 | some companies, some Facebook -- sorry -- some | 14:27:06 |
| 2 | personal social network companies have different | 14:27:11 |
| 3 | features than Facebook.  That can happen.  So there | 14:27:13 |
| 4 | could be competition in other dimensions as well. | 14:27:18 |
| 5 | Q. So in your but-for world, Facebook could | 14:27:21 |
| 6 | have responded to more competition by offering | 14:27:25 |
| 7 | better services instead of paying users; correct? | 14:27:27 |
| 8 | A. Not correct.  I think that paying users | 14:27:31 |
| 9 | would be a crucial feature of the but-for world to | 14:27:36 |
| 10 | make sure that people come to Facebook.  Now, could | 14:27:39 |
| 11 | it -- could Facebook also have better features? | 14:27:45 |
| 12 | Possibly.  I don't know.  But that's not guaranteed. | 14:27:49 |
| 13 | That's not the crucial feature. | 14:27:54 |
| 14 | Q. And in your but-for world, it's guaranteed | 14:27:55 |
| 15 | that Facebook would be paying users? | 14:27:58 |
| 16 | A. Yes, it is guaranteed that Facebook would be | 14:28:00 |
| 17 | paying users because that's the way to attract users | 14:28:03 |
| 18 | to Facebook, which are immensely valuable because | 14:28:06 |
| 19 | they generate revenue from -- from advertisers, from | 14:28:10 |
| 20 | advertisers. | 14:28:16 |
| 21 | Q. Okay.  But not -- but even in your but-for | 14:28:17 |
| 22 | world, other companies might not pay users directly; | 14:28:20 |
| 23 | correct? | 14:28:26 |
| 24 | A. Well, I haven't done an analysis for the | 14:28:26 |
| 25 | other companies in the but-for world.  But I see as | 14:28:31 |

SER3

CONTAINS CONFIDENTIAL & HIGHLY CONFIDENTIAL INFORMATION
Transcript of Nicholas Economides, Ph.D.
Conducted on September 14, 2023                           115

1   Facebook, but they didn't play any big active role.          14:48:06

2   But I was able to find them because they were on             14:48:11

3   Facebook.  So they were in some way content for me.          14:48:13

4   It helped me for them to be -- to be there.  So not          14:48:20

5   only I can provide content, but also the fact that           14:48:24

6   they were there provided me with content.                    14:48:29

7       Q. Since they were from high school (audio               14:48:33

8   disruption) were not on Facebook, but let me move            14:48:37

9   forward.                                                     14:48:40

10      So I want to come back to creating content               14:48:40

11  in just a second, but if I could ask you when I ask          14:48:45

12  you about consuming content to focus on that for a           14:48:48

13  minute.  Are there any examples in the real world            14:48:52

14  that you're aware of where users are paid to consume         14:48:55

15  content?                                                     14:48:59

16      A. Well -- well, there might be.  Nothing comes          14:49:05

17  to mind right at this moment, but there might be.            14:49:18

18      Q. I promise we'll get to this but sitting here          14:49:21

19  today, you can't think of any examples in the real           14:49:24

20  world where users are paid to consume content?               14:49:27

21      A. I cannot think of an example right now, but           14:49:37

22  I don't know how relevant that would be to Facebook          14:49:40

23  since in Facebook, users, at least in the but-for            14:49:43

24  world that I propose, would be paid to subscribe to          14:49:48

25  Facebook and therefore not to consume content but            14:49:57

SER4

CONTAINS CONFIDENTIAL & HIGHLY CONFIDENTIAL INFORMATION
Transcript of Nicholas Economides, Ph.D.
Conducted on September 14, 2023                         116

| | | |
|---|---|---|
| 1 | also be there for ads that Facebook might create on | 14:49:59 |
| 2 | them and so on. | 14:50:03 |
| 3 | Q. So you've already alluded to this.  There | 14:50:04 |
| 4 | are examples in the real world where users are paid | 14:50:08 |
| 5 | to create content; correct? | 14:50:10 |
| 6 | A. Correct.  And additionally, I would say that | 14:50:15 |
| 7 | in the context of personal social network like | 14:50:18 |
| 8 | Facebook, users are also themselves content.  Going | 14:50:23 |
| 9 | back to the example of my high school classmate who | 14:50:32 |
| 10 | didn't participate in many activities in Facebook, | 14:50:37 |
| 11 | but I could still find him because he was in | 14:50:40 |
| 12 | Facebook.  So the existence of him in Facebook is | 14:50:42 |
| 13 | content. | 14:50:45 |
| 14 | And my proposal for the but-for world would | 14:50:46 |
| 15 | make sure that these people, even these people who | 14:50:52 |
| 16 | don't participate much in Facebook, are attracted to | 14:50:56 |
| 17 | Facebook and are useful for myself from a user of | 14:50:58 |
| 18 | Facebook, for other users of Facebook, for ads, and | 14:51:05 |
| 19 | so on. | 14:51:08 |
| 20 | Q. In the real world in situations where people | 14:51:09 |
| 21 | are paid to create content, are there examples where | 14:51:12 |
| 22 | all content is compensated regardless of who makes | 14:51:16 |
| 23 | that content and regardless of content quality? | 14:51:20 |
| 24 | A. I mean that would depend on the service | 14:51:31 |
| 25 | where you say whether all people are compensated or | 14:51:33 |

SER5

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4    ----------------------------x

5    MAXIMILIAN KLEIN, et al., on  :

6    behalf of themselves and all  :

7    others similarly situated,    :  Case No.

8              Plaintiffs,    :  3:20-cv-08570-JD

9         v.                   :

10   META PLATFORMS, INC., a       :

11   Delaware Corporation          :

12   headquartered in California,  :

13             Defendant.     :

14   ----------------------------x

15             HIGHLY CONFIDENTIAL

16

17            Videotaped Deposition of

18          NICHOLAS ECONOMIDES, Ph.D.

19          Conducted virtually via Zoom

20            Friday, March 15, 2024

21                9:03 a.m. CST

22   Job No.: 52164

23   Pages: 1 - 297

24   Reported by: THERESA A. VORKAPIC,

25             CSR, RMR, CRR, RPR

HIGHLY CONFIDENTIAL
Transcript of Nicholas Economides, Ph.D.
Conducted on March 15, 2024                    20

| | | |
|---|---|---|
| 1 | from your question. | 09:21:55 |
| 2 | Q  Just answer the question I'm asking.  I | 09:22:00 |
| 3 | didn't say anything about ad revenue in that | 09:22:02 |
| 4 | question.  The question I asked you was whether | 09:22:04 |
| 5 | you would agree with me that Meta is incentivized | 09:22:06 |
| 6 | to compete to maximize time spent from its users? | 09:22:09 |
| 7 | A  Well, this question presupposes the time | 09:22:16 |
| 8 | spent will yield clicks on ads, correct?  Correct, | 09:22:24 |
| 9 | right, we don't disagree on that. | 09:22:28 |
| 10 | So Meta is incentivized to have the | 09:22:30 |
| 11 | appropriate ads so that users would click on them. | 09:22:36 |
| 12 | If users have more time in Facebook, if they have | 09:22:46 |
| 13 | more connections and they spend more time because | 09:22:50 |
| 14 | of the more connections, they are in general more | 09:22:52 |
| 15 | likely to click on ads. | 09:22:57 |
| 16 | Q  Okay.  So going back to my question, the | 09:23:00 |
| 17 | answer is that Meta is incentivized to maximize | 09:23:02 |
| 18 | the time that users spend on the platform; isn't | 09:23:07 |
| 19 | that right? | 09:23:11 |
| 20 | MS. SCARLETT:  Objection to form. | 09:23:11 |
| 21 | BY THE WITNESS: | 09:23:18 |
| 22 | A  Well, Facebook would like users to spend | 09:23:19 |
| 23 | time there.  This is definitely one of the | 09:23:20 |
| 24 | objectives.  The other objective would be to make | 09:23:23 |
| 25 | sure that people put comment, make friends, create | 09:23:26 |

**SER7**

HIGHLY CONFIDENTIAL
Transcript of Nicholas Economides, Ph.D.
Conducted on March 15, 2024                    21

| | | |
|---|---|---|
| 1 | relationships so that, in fact, it's important to | 09:23:32 |
| 2 | them to be on Facebook. | 09:23:35 |
| 3 | BY MS. MEHTA: | 09:23:37 |
| 4 | Q  Okay.  And with respect to -- again, I'm | 09:23:38 |
| 5 | not talking about making friends or the content, | 09:23:41 |
| 6 | I'm specifically talking about time spent right | 09:23:44 |
| 7 | now. | 09:23:46 |
| 8 | With respect to time spent, one of the | 09:23:46 |
| 9 | reasons that Meta is incentivized to maximize time | 09:23:49 |
| 10 | spent is that as time spent increases, so does ad | 09:23:54 |
| 11 | revenue; isn't that right? | 09:23:58 |
| 12 | A  Well, in general, as more time -- as | 09:24:06 |
| 13 | somebody spends more time on Facebook, he has a | 09:24:10 |
| 14 | bigger chance to see more ads.  Whether that | 09:24:13 |
| 15 | increases the revenue of Facebook depends on the | 09:24:17 |
| 16 | nature of ads, how close they are to the interests | 09:24:22 |
| 17 | of the users and other factors. | 09:24:26 |
| 18 | Q  And in your Appendix D, the chart we just | 09:24:31 |
| 19 | looked at, showed that overall, so not with | 09:24:34 |
| 20 | respect to any specific user, but overall as time | 09:24:36 |
| 21 | spent increases, so does advertising revenue; | 09:24:41 |
| 22 | isn't that right? | 09:24:44 |
| 23 | A  In general terms, that's what Appendix D | 09:24:46 |
| 24 | shows. | 09:24:49 |
| 25 | Q  Okay.  Now, you have seen evidence in this | 09:24:50 |

SER8

HIGHLY CONFIDENTIAL
Transcript of Nicholas Economides, Ph.D.
Conducted on March 15, 2024                            255

| | | |
|---|---|---|
| 1 | BY MS. MEHTA: | 16:37:55 |
| 2 | Q  Okay, Dr. Economides, I want to switch to | 16:37:57 |
| 3 | talking about your damages analysis for a bit. | 16:37:59 |
| 4 | And the first question I have for you is:  Since | 16:38:03 |
| 5 | your class certification deposition last summer, | 16:38:04 |
| 6 | have you identified any platforms that pay all of | 16:38:11 |
| 7 | their users for use of the platform? | 16:38:18 |
| 8 | A  You mean -- I'm not sure I completely | 16:38:36 |
| 9 | understand what you're saying, so can you say it | 16:38:38 |
| 10 | again? | 16:38:39 |
| 11 | Q  Yes, I can. | 16:38:40 |
| 12 | So your testimony -- well, actually, let | 16:38:41 |
| 13 | me ask the question this way:  In the time since | 16:38:49 |
| 14 | your class certification deposition and whatever | 16:38:52 |
| 15 | additional work you've done since then, have you | 16:38:57 |
| 16 | identified any platform that pays all of its users | 16:38:58 |
| 17 | for their activity on the platform, just their | 16:39:04 |
| 18 | normal activity? | 16:39:10 |
| 19 | MS. SCARLETT:  Objection to form. | 16:39:11 |
| 20 | BY THE WITNESS: | 16:39:11 |
| 21 | A  Well, I think I understand what you're | 16:39:18 |
| 22 | saying, and, no, since my deposition I haven't | 16:39:20 |
| 23 | identified any platforms that pay everybody. | 16:39:22 |
| 24 | BY MS. MEHTA: | 16:39:25 |
| 25 | Q  Now, you have not seen any documents or | 16:39:47 |

SER9

1

2

3

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Shana E. Scarlett (Bar No. 217895)
shanas@hbsslaw.com
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000

4

5

6

*Interim Co-Lead Consumer Class Counsel*

[Additional counsel listed on signature page]

7

8

9

10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

11

12

13

14

15

16

17

MAXIMILIAN KLEIN, *et al.*,

            Plaintiffs,

        v.

META PLATFORMS, INC.,

            Defendant.

This Document Relates To: All Consumer
Actions

Consolidated Case No. 3:20-cv-08570-JD

**CONSUMER PLAINTIFFS' RENEWED
MOTION FOR CLASS CERTIFICATION
AND APPOINTMENT OF CLASS
COUNSEL**

The Hon. James Donato
Date: TBD

**REDACTED VERSION**

18

19

20

21

22

23

24

25

26

27

28

scheme under Section 2 of the Sherman Act, and seek to certify a class consisting of all persons in the United States who maintained and used a Facebook profile between December 3, 2016 and December 3, 2020 (the "Consumer Class").

All of the elements of plaintiffs' claim turn on common evidence. Liability, including whether Facebook engaged in a deceptive course of conduct by misrepresenting and failing to disclose relevant facts to the market, focuses entirely on Facebook's acts, as Facebook made its misleading disclosures and omissions market wide. Antitrust impact and damages are also both common issues turning on common evidence. Consumers seek the difference between what Facebook paid them for their data in the monopolized, real world ($0) and what they would have received in compensation in the competitive, *but-for* world (approximately $5/month).

This $5/month compensation derives from three factual bases. *First*, is the well-accepted concept of "zero-price markets," where consumers pay no cash for a product, but the product is not free. Consumers pay for the product with something of value other than cash; often, their data. In such markets, competition can force the price "negative," meaning the product provider compensates the user for their data. (Anyone who has received discounts at the supermarket in exchange for providing their purchase history via a "club" card has experienced this concept in practice.) *Second*, this compensation model is also supported by a number of comparable real-world instances where large, well-known companies paid users for their data, including Facebook. Each of these yardsticks occur under circumstances where Facebook and the other companies needed to disclose the full extent of their data collection and use and to compensate users accordingly, just like Facebook would have needed to do in the *but-for* world. The *third* factual basis supporting classwide impact and damages is that, in the actual world, Facebook offered the same terms to all users for their data regardless of their individual preferences. It did not and could not negotiate individual terms with individual users. The same uniform (and inherently common) approach would have held true in the *but-for* world. For that reason, all users suffered the same harm—a $5 monthly overcharge.

As this record of common evidence establishes, the Consumer Class satisfies all of Rule 23's certification requirements. With respect to Rule 23(a), numerosity exists; class members

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION                    Case No. 3:20-cv-08570-JD

1   ▮▮▮▮ Ex. 29 at 2 (Savage Dep.).

2   Finally, the record shows that these claims were not readily susceptible of neutralization.

3   Documents, witness testimony, and expert analysis confirm Facebook's deception had an

4   anticompetitive effect on and contributed to the defeat of its competitors such as MySpace,

5   Google+, Snapchat, and MeWe. Economides ¶¶ 51–59. Since deception is hidden and Facebook

6   obfuscated its data practices, Facebook's rivals necessarily could not expose Facebook's actual

7   data practices or Facebook's deceptive statements and omissions as to them.

8   Answering questions on Facebook's deception and its impact on the market creates no

9   barrier for class certification. There is no individualized inquiry or proof required to determine

10   Facebook's liability.

11   **4.    Common evidence will demonstrate all class members suffered antitrust
            impact.**

12   At the class certification stage, all that is required for impact is a showing "predominantly

13   with generalized evidence, that all (or nearly all) members of the class suffered damage as a result

14   of defendants alleged anti-competitive conduct."[44] The "driving question" is "what did defendants'

15   scheme do to the market?"[45] Here, consumers answer this common inquiry with common proof

16   establishing that Facebook's deception harmed competition during the Class Period, which in turn

17   harmed **all** class members. Classwide antitrust impact therefore predominates.

18   Impact is common to all class members, because in the actual world (where Facebook

19   monopolized the PSN market), all class members paid the same "price" to Facebook: their data.

20   In exchange, class members received the same "overcharge:" zero compensation. Although

21   Facebook operates in a zero-price market, where there is no monetary price, the product is not

22   "free." The concept of zero-price markets is well-accepted, as is the notion that competition in

23   such markets will force the price **negative** (*i.e.*, include a payment from the product provider to

24   the consumer). This outcome follows from basic economic principles that show when consumers

25   have competitive alternatives, sellers are forced to lower their prices to maintain market share, and

26   if they do not, they will lose customers. Economides ¶¶ 60–93.

27   

28   [44] *Glumetza*, 336 F.R.D. at 476 (internal citations omitted).
    [45] *Id.*

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION         Case No. 3:20-cv-08570-JD

Compensation for data is not new. A common example is supermarket loyalty cards. In exchange for data to supermarket chains about one's shopping habits, consumers receive discounts (monetary compensation) in return. *See* Ex. 38 at 2. This is a well-recognized phenomenon, and many companies in the digital economy (including Nielsen, Comscore, Google, Microsoft, Amazon, and even Facebook itself) have compensated consumers for their data. Economides ¶¶ 94–108.

Dr. Economides applies these well-accepted economic theories to the facts of this case, including reviewing internal documents and testimony, market analyses, Facebook's business model for its personal social network (*i.e.*, revenues generated by advertising based on user data Facebook collected from its users), and the real-world prices paid for consumer data. He then concludes that Facebook would have compensated Consumers a certain amount per month for their data in the *but-for* world where consumers knew the truth about Facebook's data practices, because the alternative would have led to an unacceptable loss of market share for Facebook. Had Facebook not compensated its users in the *but-for* world, it would have lost *enough* consumers to lose its dominant position. And even in the face of payments to class members, Facebook would have continued to make comfortable profits even after compensating Consumers. *Id.* ¶¶ 94-108.

Dr. Economides concludes that, as in the actual world, Facebook would have compensated all consumers a flat amount in the *but-for* world. Compensation would have been market-wide because all class members would receive compensation (rather than a subset), and flat because the same rate price would have been offered to everyone. This is consistent with the actual world, where Facebook offers the same terms, including "price" (data collection) and compensation for data (none), to every class member that uses Facebook. Real-world evidence supports that Facebook and third parties prefer to pay consumers a flat and market-wide price for their data and that price is not subject to individual negotiation. Ex. 39 at 2-4 (Ben-Zedeff 30(b)(6) Dep.). It would make sense for Facebook to do so given it simplifies execution, is easily understood by consumers, avoids conflicts and fairness issues associated with price discrimination, and minimizes administrative costs. Economides ¶¶ 77–83.

The question of antitrust impact here supports a finding of predominance. Given that all

CONSUMER PLS.' RENEWED MOT. FOR CLASS CERTIFICATION        Case No. 3:20-cv-08570-JD

class members purchased a product (Facebook) at a supra-competitive price during the class period, all are harmed similarly, and all are entitled to recover the monopoly overcharge that they paid for that product. In *Olean*, the Ninth Circuit made clear that the relevant question for class certification is simply "whether each member of the class can rely on [the expert's] model to show antitrust impact of any amount."[46] The answer here is yes, because Dr. Economides' analysis is market-wide, applies equally to all consumers, and shows Facebook's anticompetitive deception harmed each class member.

### 5.    Using the well-established yardstick model, Dr. Economides calculates damages to the class.

Common evidence is available to quantify the Consumer Class's damages.[47] The total class overcharge is "the difference between what class members actually paid and what they should have paid."[48] Dr. Economides has calculated damages based on what consumers should have received from Facebook for their data, versus the zero compensation they actually received.

Using the well-accepted yardstick method, Dr. Economides calculates a competitive level of monthly compensation .[49] The "yardstick methodology compares the outcome of interest in the affected market" (how much Facebook paid consumers for their data in the actual world, where it monopolized the PSNS market) "to the same outcome in an unaffected benchmark market" (how much other companies in a non-monopolized, comparable market paid individuals for their data).[50] Courts regularly rely on yardstick models to find predominance under Rule 23(b)(3).[51]

---

[46] *Olean*, 31 F.4th 651, 679 (9th Cir.). *See also* 6 Newberg & Rubenstein on Class Actions § 20:28 (6th ed.) (courts "routinely" certify classes in overcharge cases, collecting cases); *see also Glumetza*, 336 F.R.D. at 476–478 (all class members paying overcharge resulting from anticompetitive conduct sufficient to established common questions regarding classwide antitrust impact predominated).

[47] *Apple*, 139 S. Ct. at 1525.

[48] *Glumetza*, 336 F.R.D. at 479.

[49] *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *8 (C.D. Cal. Feb. 7, 2023) (yardstick methodology "is an accepted methodology in antitrust cases" for calculating damages); *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *8 (N.D. Ill. Mar. 29, 2023) (same).

[50] *Sunday Ticket*, 2023 WL 1813530, at *8 n.1 (sic).

[51] *See, e.g., Sunday Ticket*, 2023 WL 1813530, at *12 (certifying class, and finding expert's yardstick model sufficient to show that "damages are capable of being proven on a classwide basis); *Moehrl*, 2023 WL 2683199, at *18, *20 (certifying class, including based on yardstick-based

1  **HAGENS BERMAN SOBOL SHAPIRO LLP**       **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
   Shana E. Scarlett (Bar No. 217895)         Kevin Y. Teruya (Bar No. 235916)
2  shanas@hbsslaw.com                          kevinteruya@quinnemanuel.com
3  715 Hearst Avenue, Suite 300                865 South Figueroa Street, 10th Floor
   Berkeley, CA 94710                          Los Angeles, CA 90017
4  Telephone: (510) 725-3000                   Telephone: (213) 443-3000

5  *Interim Co-Lead Consumer Class Counsel*

6  [Additional counsel listed on signature page]

7
8                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
10                     **SAN FRANCISCO DIVISION**

11  | MAXIMILIAN KLEIN, et al., | Consolidated Case No. 3:20-cv-08570-JD |

12  |            Plaintiffs, | **CONSUMER PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** |

13  |       vs. |  |

14  | META PLATFORMS, INC., | The Hon. James Donato |

15  |            Defendant. | Hearing Date: September 26, 2024 |

16  | This Document Relates To: All Consumer Actions | Hearing Time: 10:00 a.m. |

17  | | **REDACTED VERSION FILED PUBLICLY** |

18
19
20
21
22
23
24
25
26
27
28

# **INTRODUCTION**

Consumers—users of Facebook who maintain accounts—have met all the elements of Rule 23. Facebook's opposition to class certification reads more like a motion for summary judgment or a trial brief, attacking the merits of Plaintiffs' liability, impact, and damages theories. But certification "is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits." *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *10 (N.D. Cal. Nov. 14, 2018). Facebook also launches baseless attacks on the three named Plaintiffs, suggesting they are not typical or adequate representatives. Each, however, shares the same incentives and interests as absent class members in prosecuting these claims. All of Facebook's arguments lack merit.

***First***, *Comcast* is satisfied. Consumers' expert, Dr. Economides, has proffered a yardstick damages model that is directly tied to Consumers' single, live (not dismissed) liability theory. The record and caselaw shows there is no disaggregation issue—neither Facebook's anticompetitive deception nor its resulting monopoly power has been found lawful. And Facebook's complaints about the comparability and significance of the yardsticks are questions for the jury, ***not*** certification.

***Second***, the extensive, class-wide record evidence and accepted economic theory show antitrust impact here. In the but-for world, Facebook would compensate ***all*** Class members for their data at a competitive flat rate ($5 per month), so ***all*** were harmed in the actual world. Even if disputed, this question would be resolved on a class-wide basis, supporting certification. And because Consumers' model is that ***all*** Class members would be compensated, no individualized issues arise. All the arguments raised by Facebook are disputed class-wide merits issues it can argue to the jury. And, class-wide evidence shows both privacy and data are such critical matters to the market that Facebook's deception regarding them harmed competition—implicating no individual issues.

***Third***, both relevant market and monopoly power are common questions whose answers do not differ by Class member. Facebook's (raised-for-the-first-time) challenges to relevant market and monopoly power fail. It has already conceded these are merits issues, and its expert, Dr. Tucker, offers zero analysis of them for that reason. Challenging them now thus only supports certification.

***Finally***, the named Plaintiffs are both adequate and typical. Each asserts the same claims, based on the same conduct, resulting in the same claimed injury as the Class. And each cares about

CONSUMER PLS.' REPLY ISO RENEWED MOTION FOR CLASS CERTIFICATION [REDACTED]

HIGHLY CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

MAXIMILLIAN KLEIN, *et al.*,

                    Plaintiffs,

    v.

META PLATFORMS, INC.,

                    Defendant.

This Document Relates To: All Consumer Actions

Case No. 3:20-cv-08570-JD

## EXPERT REPORT OF DR. NICHOLAS ECONOMIDES

## JANUARY 12, 2024

## HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**SER17**

HIGHLY CONFIDENTIAL

274. In this section, I demonstrate that the impact of the anticompetitive effects (detailed above) of Facebook's deceptive conduct caused anticompetitive harm to all or nearly all Consumer Class members.[690]

275. As I showed elsewhere in this report, in the but-for world Facebook would not have deceptively collected and used consumer data, and as a result it would have faced substantially greater competition. As I showed in the previous section, as a result of this greater competition, Facebook would have been constrained in its ability to collect and use consumer data. In order to capture the tremendous economic opportunity offered by the ability to (i) target advertisements based on user online actions and (ii) attribute online actions to advertisements, in the but-for world Facebook would have charged a lower effective price for the Facebook service; that is, it would have offset the data collected from users with additional consideration, in the form of a flat fee payment (or non-cash equivalent) to each active user.

276. In this section, I briefly consider the effects of the but-for world on Consumer Class members. I also find that all Consumer Class members would have benefited from Facebook's cash payment. I find that Facebook would have collected and used no more data in the but-for world than in the actual world, and thus class members' harm from not receiving compensation for their data in the actual world would not have been offset by a change in data collection and use. Finally, and more generally, Consumer Class members would have benefited from greater innovation induced by greater competition in the but-for world. Thus, in total, I find that all or nearly all Consumer Class members were harmed by the challenged conduct.

### A. Facebook Would Have Charged Lower Effective Prices in the But-For World

277. As shown in the previous section, in the but-for world Facebook would have charged a lower effective price for its service by offsetting its data collection and use with compensation paid directly to users. This compensation in the but-for world would have taken the form of a "market price," meaning Facebook would have offered the same compensation market-wide, rather than negotiate compensation rates with individual users on a user-by-user basis. This is consistent with the manner in which Facebook compensates

---

[690] My opinion is that all class members were, in fact, harmed by the anticompetitive effects of Facebook's deceptive conduct. My statement that "all or nearly all" Consumer Class members were harmed reflects that there may be some de minimis number of class members that were not harmed. However, I have seen no evidence indicating as much, and I reserve the right to respond to any arguments that any such unharmed class members in fact exist, or that any evidence exists that suggest unharmed class members exist.

155

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 25-983

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Meta's Opposition to Petition for Permission to Appeal Order Denying Class Certification; Meta's Supplemental Excerpts of Record

**Signature** | s/Sonal N. Mehta | **Date** | Feb 24, 2025

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*